IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Charlotte Littlejohn, | ) | C/A No.: 1:14-2953-RMG-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Commissioner of Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civ. Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be reversed and remanded for further proceedings as set forth herein.

I.    Relevant Background

A.    Procedural History

On June 4, 2011, Plaintiff filed an application for DIB in which she alleged her disability began on March 1, 2011. Tr. at 137–38. Her application was denied initially and upon reconsideration. Tr. at 124–27, 129–30. On December 18, 2012, Plaintiff had a

hearing before Administrative Law Judge ("ALJ") Gregory M. Wilson. Tr. at 46–71 (Hr'g Tr.). The ALJ issued an unfavorable decision on March 29, 2013, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 15–45. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–4. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on July 24, 2014. [ECF No. 1].

B.     Plaintiff's Background and Medical History

1.     Background

Plaintiff was 39 years old at the time of the hearing. Tr. at 50. She obtained a bachelor's degree. *Id.* Her past relevant work ("PRW") was as an ingredient handler and a quality control clerk. Tr. at 67–68. She alleges she has been unable to work since March 1, 2011. Tr. at 137.

2.     Medical History

On March 1, 2011, Plaintiff presented to Richard Ruffing, M.D. ("Dr. Ruffing"), complaining of upper and mid back pain and elevated blood pressure. Tr. at 257. Dr. Ruffing observed Plaintiff's mid back to be mildly tender, but Plaintiff had normal reflexes and negative straight-leg raise. *Id.* Dr. Ruffing prescribed Lortab, Ultram, and Soma. *Id.*

On March 9, 2011, Plaintiff complained to Dr. Ruffing of persistent mid back pain with bending and lifting. Tr. at 256. Dr. Ruffing observed Plaintiff to have moderate tenderness in her upper and lower extremities and back, but to have adequate strength. *Id.*

He continued her prescriptions for Lortab, Ultram, and Soma and instructed her to remain out of work until after her next visit. *Id.*

Plaintiff followed up with Dr. Ruffing on March 21, 2011, and complained of persistent mid and upper back pain. Tr. at 256. Dr. Ruffing observed her to have diffuse tenderness in her back with adequate range of motion in her upper and lower extremities, adequate strength bilaterally, and normal reflexes. *Id.* He continued Plaintiff's prescriptions for Lortab, Ultram, and Soma, prescribed Tylox, and authorized Plaintiff to remain out of work until after her next visit. *Id.*

Plaintiff followed up with Dr. Ruffing on April 5, 2011, complaining of persistent back pain and stiffness and difficulty bending and lifting. Tr. at 254. Dr. Ruffing observed her to have tender back muscles with positive spasm, but noted she had full range of motion of her upper and lower extremities with adequate strength and normal reflexes. *Id.* He continued Plaintiff's prescriptions for Lortab and Ultram and prescribed Flexeril. *Id.*

Plaintiff followed up with Dr. Ruffing on April 15, 2011. Tr. at 254. She described persistent back pain, lightheadedness, dizziness, and elevated blood pressure. *Id.* Dr. Ruffing noted no abnormalities on examination. *Id.* He prescribed Zestoretic and Skelaxin and continued Plaintiff's prescription for Lortab. *Id.* He referred Plaintiff for an x-ray of her lumbar spine that indicated no abnormalities. Tr. at 215.

On May 10, 2011, Plaintiff complained to Dr. Ruffing of persistent pain in her knees and back, lightheadedness, dizziness, and hypertension. Tr. at 253. Dr. Ruffing observed Plaintiff's blood pressure to be elevated at 149/99. *Id.* He also noted mild

swelling and tenderness in her right knee. *Id.* He increased her dosage of Zestoretic, refilled Lortab, and prescribed 600 milligrams of Daypro. *Id.*

Plaintiff presented to Upstate Carolina Medical Center on May 24, 2011, complaining that she felt sick after taking a few sips of an alcoholic beverage. Tr. at 206. She reported nausea, vomiting, dyspepsia, and elevated blood pressure. Tr. at 211. Her physical examination was normal and she was diagnosed with essential hypertension and acute cephalgia. Tr. at 207. She was prescribed Zantac and Zofran and discharged to her home. *Id.*

On May 26, 2011, Plaintiff indicated to Dr. Ruffing that she had recently been under some stress. Tr. at 253. She complained of pain and stiffness in her knees and hypertension. *Id.* Plaintiff's blood pressure was elevated at 145/98. *Id.* Dr. Ruffing prescribed Tribenzor and indicated Plaintiff should remain out of work until after her next visit. *Id.* In a physician's report he completed for Plaintiff's disability insurer, Dr. Ruffing indicated Plaintiff demonstrated exaggeration, inconsistent findings, and subjective complaints out of proportion to medical findings. Tr. at 246.

Plaintiff presented to Dr. Ruffing on June 6, 2011, to follow up on hypertension. Tr. at 252. She complained of pain and stiffness in her back and knees, particularly on the right. *Id.* Her blood pressure was elevated at 152/96. *Id.* Dr. Ruffing observed tenderness in Plaintiff's right knee and back. *Id.* Plaintiff had normal reflexes and negative straight-leg raise. *Id.* Dr. Ruffing prescribed Tribenzor, Lortab, and Relafen and indicated Plaintiff should remain out of work until after her next appointment. *Id.*

4

Plaintiff followed up with Dr. Ruffing on June 21, 2011. Tr. at 252. She reported headaches, lightheadedness, dizziness, and pain in her knees, legs, and back. *Id.* Dr. Ruffing observed Plaintiff to have some crepitus and stiffness in her knees, but no edema in her legs. *Id.* Plaintiff's hypertension was improved and her blood pressure was 131/84. *Id.* Dr. Ruffing noted Plaintiff had "significant symptom magnification." *Id.* He prescribed Ultram, increased Plaintiff's dosage of Tribenzor, and continued her prescriptions for Lortab and Relafen. *Id.* He indicated Plaintiff should remain out of work until after her next visit. *Id.*

On July 13, 2011, Plaintiff complained to Dr. Ruffing of persistent headaches, dizziness, vertigo, and right knee stiffness. Tr. at 250. Her blood pressure was elevated at 154/100. *Id.* Dr. Ruffing observed Plaintiff to have crepitus in her right knee and adequate range of motion and strength. *Id.* He recommended an MRI of Plaintiff's right knee, prescribed Benicar, Lortab, and Antivert, and continued her prescription for Daypro. *Id.*

Dr. Ruffing completed an opinion statement on July 20, 2011, in which he indicated Plaintiff was diagnosed with hypertension, dizziness, and knee pain and had difficulty walking. Tr. at 239. Dr. Ruffing specified Plaintiff could continuously sit, balance, bend, reach at shoulder level, reach above shoulder level, drive, lift 10 pounds or less, carry 10 pounds or less, and push/pull 10 pounds or less; frequently stand, walk, and walk on uneven surfaces; and occasionally kneel, crawl, climb ladders and stairs, and lift and carry 11 to 50 pounds. Tr. at 240. Dr. Ruffing indicated Plaintiff was able to use her

hands for repetitive, frequent, or occasional grasping, pushing/pulling, fine manipulation, and finger dexterity. *Id.*

Plaintiff returned to Dr. Ruffing on July 29, 2011, and complained of headaches, sinus pressure, pain and stiffness in her knees, and swelling in her ankles. Tr. at 250. Dr. Ruffing noted that Plaintiff's ANA test was positive. *Id.* He observed Plaintiff to have full range of motion of her upper and lower extremities, adequate strength bilaterally, normal reflexes, and diffuse tenderness, particularly over her knees and ankles. *Id.* He prescribed Keflex, Allegra, Imipramine, and Corgard and continued Plaintiff's prescriptions for pain medications. *Id.*

On August 11, 2011, state agency consultant Seham El-Ibiary, M.D., completed a physical residual functional capacity assessment in which he indicated Plaintiff could occasionally lift and/or carry 50 pounds; could frequently lift and/or carry 25 pounds; could stand and/or walk for about six hours in an eight-hour workday; could sit for about six hours in an eight-hour workday; could frequently climb ladders, ropes, and scaffolds; and could frequently crouch. Tr. at 110–11.

Plaintiff presented to Dr. Ruffing on August 18, 2011, complaining of increasing headaches and pain in her back and knees. Tr. at 248. Plaintiff's blood pressure was 130/79 and was indicated to be "pretty well controlled on her current medication." *Id.* Dr. Ruffing noted Plaintiff was unable to stand for an eight-hour day because of arthralgias. *Id.* He increased Plaintiff's dosage of Corgard to 40 milligrams daily and refilled her prescription for Lortab. *Id.*

Plaintiff followed up with Dr. Ruffing on September 6, 2011, and complained of pain and stiffness in her arms and knees. Tr. at 248. She reported severe unilateral headaches, diffuse myalgias, and hypersensitivity. *Id.* Dr. Ruffing observed Plaintiff to have diffuse large muscle tenderness. *Id.* He prescribed Tribenzor and Savella and continued Corgard and Lortab. *Id.*

Dr. Ruffing completed a medical source statement for Plaintiff's disability insurer on September 7, 2011, in which he indicated Plaintiff was unable to return to work in any capacity and that she was specifically limited as follows: continuously sit; occasionally stand; occasionally walk; lift, carry, and push/pull up to 10 pounds; and avoid balancing, bending, walking on uneven surfaces, kneeling, crawling, climbing (ladders, stairs, etc), reaching at shoulder level, reaching above shoulder level, driving, lifting, carrying, and pushing/pulling 11 pounds or more. Tr. at 233–34. Dr. Ruffing indicated Plaintiff had no difficulty using her hands for repetitive, frequent, or occasional grasping, pushing/pulling, fine manipulation, and finger dexterity. Tr. at 235. Dr. Ruffing completed another statement in September 2011 in which he indicated Plaintiff could occasionally lift, carry, and push/pull 11 to 20 pounds. Tr. at 238. Dr. Ruffing described Plaintiff's symptoms as including diffuse pain in her knee, hip, and back, as well as headaches. Tr. at 236. He indicated Plaintiff's recovery and return to work were complicated by a comorbid mental disorder such as anxiety, depression, etc. and exaggeration, inconsistent findings, and subjective complaints that were out of proportion to the medical findings. Tr. at 237.

On October 4, 2011, Plaintiff complained to Dr. Ruffing of pain in her knees, hands, and low back, as well as dizziness and headaches. Tr. at 304. Dr. Ruffing indicated Plaintiff had a lot of symptom magnification and complained of a lot of pain with minimal touch. *Id.* Plaintiff's blood pressure was elevated at 155/106. *Id.* Dr. Ruffing observed Plaintiff to have diffuse point tenderness. *Id.* He specified Plaintiff was tender in her lower back, wrist, and bilateral knees and that she had some trace edema of her lower extremities. *Id.* Dr. Ruffing continued Tribenzor and Savella. *Id.* He indicated Plaintiff could not work a regular job because of pain manifestations and her inability to stand for an eight-hour day. *Id.* He stated that he would refer Plaintiff to a rheumatologist. *Id.*

Plaintiff presented to Muthamma J. Machimada, M.D. ("Dr. Machimada"), for an initial evaluation on October 28, 2011. Tr. at 228–31. She complained of pain, swelling in her lower extremities, morning stiffness, tingling and numbness in her bilateral upper and lower extremities, pain with range of motion of her shoulders and elbows, and ongoing swelling involving the metacarpophalangeal ("MCP") and proximal interphalangeal ("PIP") joints of her hands. Tr. at 228. Dr. Machimada observed Plaintiff to have trace to moderate synovitis involving the second to fifth PIP joints, the MCP joints, and the wrists. Tr. at 230. Plaintiff complained of pain upon flexion and extension of her wrists and palpation of her shoulders. *Id.* She demonstrated tenderness to palpation of her cervical and lumbar spine, knees, and ankles. *Id.* Lab results indicated positive ANA and elevated sedimentation rate, but all other tests were normal. Tr. at 230–31. Dr. Machimada instructed Plaintiff to discontinue Daypro, but to continue taking Lortab and

8

Soma. Tr. at 231. She prescribed Prednisone, ordered more testing, and indicated "[a]t this point, I am more concerned of the possibility of rheumatoid arthritis as a cause of her joint problems rather than an autoimmune disease process." *Id.*

On November 7, 2011, Plaintiff complained of pain and stiffness in her knees and little improvement with Savella. Tr. at 304. Dr. Ruffing again noted Plaintiff to have "lots of symptom magnification." *Id.* Plaintiff demonstrated adequate strength in her upper and lower extremities. *Id.* Dr. Ruffing continued Tribenzor, Savella, and Lortab. *Id.*

Plaintiff followed up with Dr. Machimada on November 15, 2011. Tr. at 225–26. Dr. Machimada indicated recent blood tests showed negative lupus anticoagulant, ANCA titers, rheumatoid factor, and anticardiolipin antibody titer. Tr. at 225. Plaintiff had a normal complete blood count ("CBC") and normal c-reactive protein. *Id.* Plaintiff informed Dr. Machimada that Prednisone did not ease much of her pain. *Id.* She complained that she experienced stiffness for one to two hours each morning and had persistent generalized myalgias. *Id.* She reported significant fatigue with nonrestorative sleep. *Id.* Plaintiff's blood pressure was elevated at 140/98. *Id.* Dr. Machimada found no evidence of synovitis involving Plaintiff's joints. Tr. at 226. She observed Plaintiff to have generalized myalgias with minimal palpation. *Id.* Dr. Machimada indicated "most of her pain seems to be arising from the fibromyalgia." *Id.* She scheduled Plaintiff for bilateral knee x-rays, ran an ANA panel, instructed Plaintiff to complete a Prednisone burst and taper, and prescribed 50 milligrams of Diclofenac Sodium. *Id.*

Plaintiff complained to Dr. Ruffing of pain and stiffness in her knees on December 1, 2011. Tr. at 303. She stated she had a lot of pain, but Dr. Ruffing indicated Plaintiff

was doing reasonably well. *Id.* Dr. Ruffing observed Plaintiff to have knee crepitus on examination. *Id.* He prescribed Imipramine and refilled prescriptions for Corgard and Tribenzor. *Id.*

On December 5, 2011, state agency consultant Carl Anderson, M.D., completed a physical residual functional capacity evaluation in which he indicated Plaintiff was limited as follows: never climb ladders/ropes/scaffolds; frequently crawl; and avoid concentrated exposure to hazards. Tr. at 119–20.

On December 6, 2011, Dr. Machimada indicated Plaintiff's ANA panel showed a positive anti-RNP antibody[1] titer of 1:1; negative lupus anticoagulant; and negative ANCA, anti-Smith, anti-SSA, anti-SSB, anti-Scl-70, and anti-ds DNA antibody titers. Tr. at 299. Plaintiff complained of worsening pain, swelling, and buckling in her right knee. *Id.* Dr. Machimada noted that x-rays of Plaintiff's bilateral knees indicated mild narrowing of the medial joint compartment and a high-riding patella, but no narrowing of the patellofemoral joint space. *Id.* Plaintiff indicated that Diclofenac Sodium had eased some of her pain and discomfort, but that Prednisone was not helpful. *Id.* Plaintiff complained of some swelling and pain across her MCP and PIP joints and difficulty grasping objects and making a fist. *Id.* She indicated she experienced pain and swelling in

---

[1] Positive anti-RNP antibodies suggest a reaction with protein and high titers of anti-RNP antibodies are diagnostic of mixed connective tissue disorder. National Center for Biotechnology Information [Internet], Bethesda (MD): U.S. National Library of Medicine Feb. 2005. Anti-Sm and anti-RNP antibodies. [Accessed 9 Apr 2015]. Available from: http://www.ncbi.nlm.nih.gov/pubmed/15804705. A court may take judicial notice of factual information located in postings on government websites. *See Philips v. Pitt Cnty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (court may "properly take judicial notice of matters of public record").

her wrists and shoulder pain that caused her difficulty in lifting her arms. *Id.* She stated she had knee pain with prolonged standing and walking, but denied significant pain in her elbows, neck, lower back, ankles, and feet. *Id.* Plaintiff indicated she experienced stiffness for three to four hours each morning. *Id.* Dr. Machimada described Plaintiff as being in moderate discomfort. *Id.* She observed no synovitis in Plaintiff's distal interphalangeal ("DIP") joints, but trace synovitis in her second to fifth MCP and PIP joints. Tr. at 300. Plaintiff was restricted in her ability to make a fist due to trace to moderate synovitis in her wrists. *Id.* She had no synovitis in her elbows or shoulders and intact internal and external rotation of her shoulders. *Id.* Dr. Machimada noted no tenderness to palpation of Plaintiff's cervical, thoracic, or lumbar spine and no synovitis in her knees, ankles, or the metatarsophalangeal ("MTP") joints of her feet. *Id.* She increased Plaintiff's dosage of Lortab, refilled Diclofenac Sodium, and indicated she planned to prescribe Plaquenil at a future visit. *Id.*

On January 2, 2012, Plaintiff complained of pain and stiffness in her arms and legs. Tr. at 303. Dr. Ruffing observed Plaintiff to have good range of motion of her upper and lower extremities. *Id.* Because Plaintiff complained of heart palpitations, Dr. Ruffing replaced her prescription for Corgard with Lopressor and refilled Tribenzor. *Id.*

Plaintiff followed up with Dr. Machimada on January 12, 2012, and reported significant pain in the small joints of her hands and feet, morning stiffness lasting 30 to 45 minutes at a time, lower back and neck pain, and weakened grip strength. Tr. at 296. Dr. Machimada observed no evidence of synovitis in Plaintiff's DIP joints, but moderate synovitis in her MCP and PIP joints and trace to moderate synovitis in her wrists. *Id.*

Plaintiff expressed pain when making a fist. *Id.* Dr. Machimada noted Plaintiff to have tenderness on palpation of the medial and lateral aspects of her elbows, but to have intact elbow flexion and extension. *Id.* She observed tenderness in the anterior aspect of Plaintiff's shoulders with pain on abduction and internal rotation. *Id.* Plaintiff was also tender to palpation in the paraspinal muscles around her neck and in her lower back. *Id.* Plaintiff had some intermittent tingling and numbness down her upper and lower extremities, but did not have synovitis in her MTP joints, bruising, rashes, or subcutaneous nodules in the extensor aspect of her elbows. Tr. at 297. Dr. Machimada continued Plaintiff's prescriptions for Diclofenac Sodium and Lortab and prescribed Plaquenil. *Id.*

Plaintiff followed up with Dr. Ruffing on January 17, 2012. Tr. at 247. Her blood pressure was elevated at 145/102. *Id.* Dr. Ruffing noted that Plaintiff had recently started taking Plaquenil, but that she continued to complain of diffuse stiffness in her upper and lower extremities and a lot of inflammatory symptoms. *Id.* Dr. Ruffing observed Plaintiff to have diffuse tenderness in her upper and lower extremities, but to demonstrate "[a] lot of symptom magnification." *Id.* He indicated "I do not think that this patient can go back to work" based on "significant rheumatologic disease." *Id.*

On February 23, 2012, Plaintiff indicated to Dr. Machimada that she was experiencing generalized myalgias with increased sensation to touch. Tr. at 293. Plaintiff indicated Diclofenac was not helping her pain and that she had taken more Lortab than she was prescribed. *Id.* Plaintiff stated that it took her 30 to 45 minutes to "limber up" in the small joints of her hands and feet. *Id.* She complained that her pain prevented her

from falling asleep at night. *Id.* Dr. Machimada noted that with prolonged standing and walking, Plaintiff had not had much lower back pain or tingling and numbness down her lower extremities. *Id.* She noted no evidence of synovitis in any of Plaintiff's joints, but observed tenderness on palpation of multiple muscle groups, which she indicated to be suggestive of fibromyalgia. *Id.* Dr. Machimada prescribed Lyrica and continued Plaintiff's prescription for Plaquenil. Tr. at 294.

On March 26, 2012, Dr. Ruffing completed a questionnaire in which he indicated Plaintiff was unable to perform sedentary work because of pain in her hands and knee; that she would most probably need to rest away from the work station for more than an hour during a typical workday; that she would likely miss more than three days of work per month; and that she would likely have to elevate her legs for more than an hour per day because of pain and swelling. Tr. at 279. Dr. Ruffing indicated Plaintiff would not have problems with attention and concentration that would interrupt tasks during the workday. *Id.* He indicated Plaintiff was diagnosed with rheumatoid arthritis and that his opinion was based on prior examinations. Tr. at 279–80.

On April 19, 2012, Plaintiff complained to Dr. Machimada of pain across her MCP and PCP joints, in the ball of her foot, and in her ankles, heel, shoulder, and elbow. Tr. at 290. She reported difficulty with grip strength. *Id.* Plaintiff indicated she was unable to afford Lyrica, but continued to take Plaquenil. *Id.* Dr. Machimada observed Plaintiff to have no synovitis in any of her joints, but noted she had increased sensitivity to touch in her upper and lower extremities. *Id.* She indicated Plaintiff should wean off

Lyrica and start Amitriptyline. Tr. at 291. She refilled Plaintiff's prescription for Lortab. *Id.*

Plaintiff presented to Dr. Ruffing on May 1, 2012, complaining of headache, dizziness, sinus congestion, and bilateral knee pain. Tr. at 283. Dr. Ruffing noted sinus congestion and diagnosed sinusitis and osteoarthritis of the knees. *Id.* He prescribed Keflex and Claritin, indicated Plaintiff should remain out of work, and stated "[m]ost likely she is probably totally and permanently disabled." *Id.*

Plaintiff followed up with Dr. Ruffing for joint pain and stiffness on June 7, 2012. Tr. at 283. She complained of intermittent headaches. *Id.* Dr. Ruffing noted no abnormalities on examination and continued Plaintiff's medications. *Id.*

On June 14, 2012, Dr. Machimada indicated Plaintiff had no symptoms of mixed connective tissue disease, but that her fibromyalgia symptoms were prevalent. Tr. at 287. Plaintiff stated that Elavil had helped her to feel more rested upon waking, but that she continued to experience generalized myalgias all over that limited her ability to function. *Id.* She complained of swelling in her knees and pain and swelling in the MCP and PIP joints of her hands, accompanied by weakened grip strength. *Id.* Plaintiff complained of intermittent pain in her shoulders and in the paraspinal muscles of her neck and intermittent tingling and numbness from her elbows to her fingertips. *Id.* Dr. Machimada observed no synovitis in Plaintiff's joints. Tr. at 288. Plaintiff had normal abduction and internal rotation of her shoulders and normal internal and external rotation of her hips. *Id.* Dr. Machimada observed some tenderness upon palpation of the paraspinal muscles of

Plaintiff's neck and her back. *Id.* She noted the presence of metatarsalgia. *Id.* She instructed Plaintiff to continue taking Elavil, Lortab, and Plaquenil. *Id.*

Dr. Machimada submitted a statement dated August 10, 2012, in which she indicated she had treated Plaintiff since October 2011. Tr. at 281. She indicated Plaintiff complained of chronic widespread pain in her joints and muscles and presented with consistently high pain scores. *Id.* She stated she had diagnosed fibromyalgia and that Plaintiff might develop a mixed connective tissue disorder in the future, based on her test results. *Id.* Dr. Machimada indicated Plaintiff complained that her pain interfered with her ability to concentrate, impaired her sleep, and caused her to experience daytime drowsiness. *Id.* She indicated that Plaintiff's complaints were consistent with her in-office observations ("notably drowsy and has difficulty concentrating") and with Plaintiff's condition. *Id.* Dr. Machimada indicated she found Plaintiff's complaints to be credible based upon the consistency of Plaintiff's presentation over time. *Id.*

On August 22, 2012, Plaintiff complained to Dr. Ruffing of diffuse achiness in her upper extremities. Tr. at 282. Dr. Ruffing observed no abnormalities on examination. *Id.* He prescribed Esgic and wrote a note for Plaintiff to remain out of work. *Id.*

Plaintiff followed up with Dr. Machimada on August 27, 2012. Tr. at 284–85. Dr. Machimada indicated Plaintiff had not demonstrated any symptoms of connective tissue disease, but had demonstrated more symptoms suggestive of fibromyalgia with mild degenerative arthritis of her knees. *Id.* Plaintiff described pain that radiated from her knees to her calves and toes. Tr. at 284. She also complained of intermittent neck and lower back pain and numbness from her wrists to her fingertips. *Id.* She described

intermittent stiffness and pain in the small joints of her hands and feet. *Id.* Dr. Machimada indicated Plaintiff had run out of Hydrocodone, which was no longer helping with pain relief. *Id.* She observed Plaintiff to have no synovitis in her joints. Tr. at 285. She noted some tenderness on palpation of Plaintiff's cervical and lumbar spine. *Id.* Dr. Machimada instructed Plaintiff to continue taking Plaquenil and Elavil and prescribed Neurontin for neuropathy. *Id.*

On March 7, 2013, Dr. Machimada provided a physician's statement for Plaintiff to obtain a disabled placard for her vehicle. Tr. at 308. She indicated Plaintiff had "an inability to ordinarily walk without the use of, or assistance from a brace, cane, crutch, another person, prosthetic device, wheelchair or other assistive device" and "a substantial limitation in the ability to walk due to an arthritic, neurological, or orthopedic condition." *Id.* She stated the restriction was temporary and would last 12 months. *Id.* She also wrote that "[p]atient has difficulty ambulating." Tr. at 309.

On March 20, 2013, Dr. Ruffing completed another physician's report for Plaintiff's insurance company. Tr. at 305–07. He indicated Plaintiff's diagnoses included rheumatoid arthritis and osteoarthritis; that Plaintiff experienced diffuse pain; that Plaintiff took chronic pain medication; and that he did not expect that Plaintiff would be able to return to work. Tr. at 305. Dr. Ruffing stated Plaintiff could continuously sit; could occasionally stand, walk, balance, lift one to ten pounds, carry one to ten pounds, and push/pull one to ten pounds. Tr. at 306. He indicated Plaintiff could use her hands for repetitive, frequent, or occasional grasping, pushing/pulling, fine manipulation, and finger dexterity. *Id.*

C.     The Administrative Proceedings

1.     The Administrative Hearing

a.     Plaintiff's Testimony

At the hearing on December 18, 2012, Plaintiff testified that she lived with her two sons, ages four and 19. Tr. at 51. She indicated she last worked for Nestle on March 1, 2011. *Id.* She stated she worked for 15 years as an ingredient handler, a backup clerk in quality assurance, and in different branches of the plant. Tr. at 51–52. Plaintiff stated she did not file for unemployment benefits or workers' compensation. Tr. at 51. She indicated she received short-term disability insurance benefits. *Id.*

Plaintiff testified she had difficulty standing and sitting prior to leaving her job at Nestle. Tr. at 53. She indicated she experienced swelling in her fingers, feet, and legs. *Id.* She stated that her supervisors told her it would not be fair to others if they allowed her to prop up her feet while working. *Id.*

Plaintiff testified she had rheumatoid arthritis. Tr. at 53. She indicated Dr. Ruffing diagnosed her as having osteoarthritis in her knees three years earlier. Tr. at 54. She stated she had migraine headaches and hypertension. *Id.* She indicated she was experiencing dizziness and lightheadedness when she stopped working in March 2011. *Id.* Plaintiff testified her migraines occurred two to three times per week and could last for a day or two. Tr. at 55, 63. She also indicated she was diagnosed with fibromyalgia in September or October 2011. Tr. at 55.

Plaintiff testified she experienced swelling in all her joints, but that her hands and knees were the worst. Tr. at 55–56. She stated she elevated her legs for most of a typical

day to reduce swelling. Tr. at 56. She indicated she was no longer able to use a computer keyboard because of swelling in her hands and that she had difficulty opening jars and turning door knobs. *Id.* Plaintiff stated that she dropped her younger son a year earlier as she tried to carry him in from the car while he was sleeping. Tr. at 57. Plaintiff indicated she experienced stiffness and pain in her shoulders. Tr. at 59.

Plaintiff testified she was prescribed Lortab and that she took four pills the previous day. Tr. at 57. She stated she took medication for her blood pressure, but that her blood pressure continued to fluctuate. *Id.* She confirmed she was on Amitriptyline to sleep and Savella for arthritis. *Id.* Plaintiff indicated her medications made her drowsy, tired, and unfocused. Tr. at 58. She stated she was not supposed to drive after taking them. Tr. at 60.

Plaintiff testified she could walk about 100 feet, but denied using an assistive device. Tr. at 58. She stated she remained at home most of the time. *Id.* She indicated she did not cook and stated her older son prepared meals. Tr. at 59. She denied washing dishes, doing laundry, folding clothes, ironing, sweeping, mopping, vacuuming, emptying trash, dusting, cleaning bathrooms, cleaning the kitchen, cleaning the living room, performing home maintenance, engaging in yard work, gardening, sewing, crocheting, or driving since March 2011. Tr. at 63–65. She stated her 19-year-old goddaughter visited and assisted her with cooking, bathing, and dressing. *Id.* She indicated her mother also visited daily to check on her. Tr. at 61. Plaintiff indicated she had attended church approximately three times between March 2011 and the date of the hearing. Tr. at 65. She denied shopping, participating in hobbies, going out to eat, visiting movie theaters, and

visiting parks and other outdoor recreation sites. Tr. at 65–66. She stated she had used a computer approximately three times within the prior year. Tr. at 66.

b.     Vocational Expert Testimony

Vocational Expert ("VE") Kathleen Robbins, Ph. D., reviewed the record and testified at the hearing. Tr. at 66–70. The VE categorized Plaintiff's PRW as an ingredient handler as heavy with a specific vocational preparation ("SVP") of three and a *Dictionary of Occupational Titles* ("*DOT*") number of 929.687-030 and a quality control clerk as light with an SVP of three and a *DOT* number of 229.587-014. Tr. at 67–68. The ALJ described a hypothetical individual of Plaintiff's vocational profile who could lift 50 pounds occasionally and 25 pounds frequently; could stand for six out of eight hours; could walk for six out of eight hours; could sit for six out of eight hours; could not climb ladders, ropes, or scaffolds; could frequently crawl; and should avoid concentrated exposure to hazards. Tr. at 68. The VE testified that the hypothetical individual would be unable to perform Plaintiff's PRW. *Id.* The ALJ asked whether there were any other jobs in the region or national economy that the hypothetical person could perform. *Id.* The VE identified a medium job with an SVP of two as a hospital cleaner, *DOT* number 323.687-010, with 700 positions in South Carolina and 42,000 positions nationally; a light job with an SVP of four as a general office clerk, *DOT* number 219.362-010, with 600 positions in South Carolina and 49,000 positions nationally; and a sedentary job with an SVP of three as a data entry clerk, *DOT* number 209.562-010, with 600 positions in South Carolina and 49,000 positions nationally. Tr. at 69–70. The ALJ next asked the VE to assume the hypothetical individual would have interference with attending the

workstation on a daily basis because of a need to rest and elevate her legs for varying times from day-to-day. Tr. at 70. The ALJ asked the VE if that condition would affect her answer. *Id.* The VE stated there would be no competitive employment that such an individual could perform. *Id.*

    2.  The ALJ's Findings

  In his decision dated March 29, 2013, the ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2015.
2. The claimant has not engaged in substantial gainful activity since March 1, 2011, the alleged onset date (20 CFR 404.1571 *et seq.*).
3. The claimant has the following severe impairments: headaches, rheumatoid arthritis, degenerative joint disease of the knees, and hypertension (20 CFR 404.1520(c)).
4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).
5. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except the claimant could lift and carry up to 50 pounds occasionally and 25 pounds frequently; the claimant could sit, stand, and walk up to six hours each out of an eight-hour workday; the claimant could never climb ladders, ropes, and scaffolds; the claimant could frequently crawl; the claimant should avoid concentrated exposure to hazards.
6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).
7. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).
8. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferrable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).
9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the

national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, from March 1, 2011, through the date of this decision (20 CFR 404.1520(g)).

Tr. at 20–42.

II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1. the ALJ failed to consider Plaintiff's fibromyalgia diagnosis based on the requirements in SSR 12-2p; and

2. the ALJ improperly rejected the opinion of Plaintiff's treating physician.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

A.     Legal Framework

1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983)

21

(discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[2] (4) whether such impairment prevents claimant from performing PRW;[3] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. § 404.1520. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. § 404.1520(a)(4) (providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the

---

[2] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. § 404.1520(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. § 404.1526; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[3] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. § 404.1520(h).

work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); Social Security Ruling ("SSR") 82-62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

2.    The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

B.    Analysis

1.    SSR 12-2p

Plaintiff argues the ALJ did not properly consider her fibromyalgia diagnosis based on the requirements of SSR 12-2p. [ECF No. 10 at 21]. Although Plaintiff alleges this as part of her argument that the ALJ failed to properly consider Dr. Machimada's opinion, the undersigned considers it most appropriate to address these as separate issues.

The Commissioner argues the ALJ determined fibromyalgia to be a medically-determinable impairment, but properly relied on the evidence in concluding that it was not a severe impairment. [ECF NO. 12 at 13]. She further contends that Dr. Machimada

did not rule out other disorders that could cause Plaintiff symptoms and did not discuss Plaintiff's other symptoms, which are required for a diagnosis of fibromyalgia under SSR 12-2p. *Id.* at 13–14.

On July 25, 2012, the Social Security Administration ("SSA") published SSR 12-2p, which was designed to provide guidance on how the SSA develops evidence to establish and evaluate a medically-determinable impairment of fibromyalgia. SSR 12-2p, 2012 WL 3104869. The ruling provides that a claimant may establish fibromyalgia as a medically-determinable impairment through evidence from an acceptable medical source. *Id.* at *2. ALJs should not rely on the physician's diagnosis alone, but should review the evidence to determine if the claimant's medical history and physical examinations are consistent with the diagnosis and with the physician's statements regarding the claimant's physical strength and functional abilities. *Id.* The ruling requires that a claimant's diagnosis of fibromyalgia be confirmed through either the *1990 ACR Criteria for the Classification of Fibromyalgia* or the *2010 ACR Preliminary Diagnostic Criteria* ("2010 Criteria"). *Id.*

Dr. Machimada indicated she relied on the 2010 Criteria. *See* Tr. at 281. To establish a diagnosis under the 2010 Criteria, the claimant must have a history of widespread pain; repeated manifestations of six or more fibromyalgia symptoms, signs, or co-occurring conditions; and evidence that other disorders that could cause these repeated manifestations of symptoms, signs, or co-occurring conditions were excluded. 2012 WL 3104869 at *3. Fibromyalgia symptoms and signs that may be considered include muscle pain, irritable bowel syndrome, fatigue or tiredness, thinking or memory

problems, muscle weakness, headache, pain or cramps in the abdomen, numbness or tingling, dizziness, insomnia, depression, pain in the upper abdomen, nausea, nervousness, chest pain, blurred vision, fever, diarrhea, dry mouth, itching, wheezing, Raynaud's phenomenon, hives or welts, ringing in the ears, vomiting, heartburn, oral ulcers, loss of taste, change in taste, seizures, dry eyes, shortness of breath, loss of appetite, rash, sun sensitivity, hearing difficulties, easy bruising, hair loss, frequent urination, or bladder spasms. *Id.* at n.9. Co-occurring conditions include irritable bowel syndrome, depression, anxiety disorder, chronic fatigue syndrome, irritable bladder syndrome, interstitial cystitis, temporomandibular joint disorder, gastroesophageal reflux disorder, migraine, or restless leg syndrome. *Id.* at n.10.

If the ALJ determines fibromyalgia to be a medically-determinable impairment, he must consider the intensity and persistence of the claimant's pain and other symptoms and determine the extent to which her symptoms limit her capacity for work. *Id.* at *5. To assess the claimant's credibility, the ALJ must consider all of the evidence in the case record, including the claimant's daily activities, medications or other treatments, the nature and frequency of the claimant's medical treatment, and statements from others regarding the claimant's symptoms. *Id.*; *see also* SSR 96-7p. The ALJ must then consider fibromyalgia as part of the five-step sequential evaluation. *Id.* The ALJ should evaluate the severity of the impairment, whether the impairment medically equals the requirements of a listed impairment, and whether the impairment precludes the claimant's PRW or other work that exists in significant numbers in the national economy. *Id.*

The ALJ found that "the impairments related to fibromyalgia cause only slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work." Tr. at 20. He emphasized that Dr. Ruffing, who had a lengthy treatment relationship with Plaintiff, did not include a diagnosis of fibromyalgia among Plaintiff's diagnosed impairments, even after Plaintiff began treatment with Dr. Machimada. Tr. at 29–30. He indicated that there were other conditions that could account for Plaintiff's symptoms other than fibromyalgia, based on Plaintiff's positive ANA and anti-RNA antibody tests. Tr. at 30. He wrote "[w]hile I accept the diagnosis of fibromyalgia, the failure to rule out other disorders that could cause the fibromyalgia-like symptoms discredits Dr. Machimada's opinions." *Id.* The ALJ pointed to a "lack of accompanying signs, symptoms, and co-occurring conditions" to "suggest that the severity of fibromyalgia is not as limiting as the claimant alleges." *Id.*

The undersigned recommends the court find that the ALJ did not properly consider Plaintiff's fibromyalgia diagnosis based on the provisions of SSR 12-2p. Dr. Machimada's diagnosis of fibromyalgia as a medically-determinable impairment is supported by the record and the criteria in SSR 12-2p. As a licensed rheumatologist, Dr. Machimada was an acceptable medical source. *See* 20 C.F.R. § 404.1513(a). The record supports Dr. Machimada's assessed diagnosis of fibromyalgia and demonstrates that Plaintiff had a history of widespread pain, repeated manifestations of fibromyalgia symptoms and signs, and that Dr. Machimada had ruled out other possible disorders that could cause Plaintiff's symptoms. Records from Dr. Ruffing and Dr. Machimada indicated Plaintiff complained of widespread pain beginning on or before March 1, 2011,

27

and continued to complain of widespread pain through the last treatment dates prior to the hearing. *See* Tr. at 257, 282, 284–85. Dr. Ruffing and Dr. Machimada recorded Plaintiff to have more than six fibromyalgia-related symptoms that included muscle pain, dizziness, headaches, tingling and numbness, fatigue, muscle weakness, and insomnia. *See* Tr. at 225 (fatigue), 248 (headaches, tingling and numbness, pain in back and arms), 250 (dizziness, headaches), 252 (dizziness, leg and back pain), 253 (dizziness, back pain), 254 (back pain, dizziness), 256 (persistent mid and upper back pain), 257 (pain in upper and mid back), 283 (headaches, dizziness, tingling and numbness), 284 (tingling and numbness, pain from calves to toes and in lower back and neck), 287 (shoulder and neck pain, weakened grip strength), 290 (shoulder pain, weakened grip strength), 293 (insomnia, lower back pain), 296 (lower back and neck pain), 299 (shoulder pain), 300 (weakened grip strength), 304 (pain in hands and low back). Despite the ALJ's conclusion to the contrary, Dr. Machimada conducted extensive testing, ruled out other potential diagnoses, and explained her reasons for concluding that Plaintiff had fibromyalgia. *See* Tr. at 281. Dr. Machimada's explanation was supported by objective evidence in the record that included lab tests, x-rays, and observations. *See* Tr. at 225 (negative lupus anticoagulant, ANCA titer, rheumatoid factor, and anticardiolipin antibody titer; normal CBC and c-reactive protein), 230–31 (positive ANA and increased sedimentation, but otherwise normal blood tests), 299 (positive anti-RNP antibody titer, but other tests negative; mild osteoarthritis of knees on x-ray). Dr. Machimada explained that the only abnormalities noted on lab tests were positive ANA and positive anti-RNP antibody titer and that positive anti-RNP antibody titer could indicate mixed connective

28

tissue disorders, but that examination did not support such a diagnosis at that time. Tr. at 281.

Although the record supported the existence of fibromyalgia as a medically-determinable impairment and despite the ALJ's reluctant conclusion to that effect, the ALJ erroneously concluded that fibromyalgia had no more than a minimal effect on Plaintiff's ability to work. *See* Tr. at 20. Had the ALJ determined fibromyalgia to not be a medically-determinable impairment, his decision would not be supported based on the criteria to establish the impairment. Instead of concluding that Plaintiff did not have a medically-determinable impairment of fibromyalgia, the ALJ found she did have fibromyalgia, but that it had no effect on her ability to work. The ALJ found that because Plaintiff had some of the symptoms necessary to establish the existence of the impairment, but lacked others, her impairment was not severe.  The provisions of SSR 12-2p do not permit an ALJ to find fibromyalgia to be non-severe merely because a claimant does not demonstrate every one of the symptoms and signs that may be characteristic of the impairment. Once fibromyalgia is established as a severe impairment, the ALJ must proceed to analyze the claimant's credibility and to follow the sequential evaluation process. SSR 12-2p. Although the ALJ purported to do that in this case, his analysis of the severity of Plaintiff's impairment is colored by an apparent disbelief in Plaintiff's diagnosis of fibromyalgia and is not supported by substantial evidence. A review of the record does not reveal that the ALJ adequately considered Plaintiff's statements or evidence in the record that included Plaintiff's daily activities, her medications, or the nature and frequency of her medical treatment. Although the ALJ

summarized Plaintiff's testimony, he did not consider Plaintiff's testimony as to her limited daily activities in assessing her credibility. *See* Tr. at 22–23. The ALJ considered Plaintiff's medications and found that "the types and dosages of medications support the claimant's allegations somewhat," but he did not explain why he determined her medications did not support Plaintiff's allegations regarding fibromyalgia-related symptoms and pain, except to suggest improved symptoms based on the medication prescribed. *See* Tr. at 23, 33–34. Between March 2011 and August 2012, Plaintiff saw Dr. Ruffing at least every other month, but sometimes as frequently as three times per month. *See* Tr. at 247–57, 282–83, 303–04. Dr. Machimada treated Plaintiff on eight occasions between October 2011 and August 2012. *See* Tr. at 225–31, 284–300. At every one of these visits, Plaintiff complained of pain in various parts of her body. *See* 225–31, 247–57, 282–300, 303–304). Although the ALJ considered statements from others regarding the claimant's symptoms and concluded that they were consistent with Plaintiff's allegations, he accorded little weight to those statements. *See* Tr. at 24, 29. Because the record as a whole supported the credibility of Plaintiff's statements and suggested that symptoms of fibromyalgia had more than a minimal effect on Plaintiff's ability to function, substantial evidence did not support the ALJ's conclusion that fibromyalgia was not a severe impairment. Therefore, the undersigned recommends a finding that the ALJ failed to properly consider Plaintiff's fibromyalgia diagnosis based on the provisions of SSR 12-2p.

2.    Dr. Machimada's Opinion

Plaintiff argues the ALJ failed to weigh Dr. Machimada's opinion based on the criteria set forth in 20 C.F.R. § 404.1527(c). [ECF No. 10 at 18]. She contends that Dr. Machimada's opinion supported a finding that she was disabled. *Id.* at 19. She maintains that her treatment relationship was sufficient to support Dr. Machimada's opinion and that the opinion was consistent with the treatment records. *Id.* at 20, 24–25. She argues that Dr. Ruffing's records did not support rejection of Dr. Machimada's opinion. *Id.* at 24.

The Commissioner argues the ALJ reasonably accorded little weight to Dr. Machimada's opinion. [ECF No. 12 at 12]. She maintains that Dr. Machimada's opinion was inconsistent with substantial evidence of record, including her own treatment notes. *Id.* at 13.

If a treating source's medical opinion is "well-supported and not inconsistent with the other substantial evidence in the case record, it must be given controlling weight[.]" SSR 96-2p; *see also* 20 C.F.R. § 404.1527(c)(2) (providing treating source's opinion will be given controlling weight if well-supported by medically-acceptable clinical and laboratory diagnostic techniques and not inconsistent with other substantial evidence in the record).

Pursuant to SSR 96-2p:

Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating

source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. 404.1527.

SSA rules require that the ALJ carefully consider medical opinions on all issues. SSR 96-5p. Pursuant to 20 C.F.R. § 404.1527(c), if a treating source's opinion is not accorded controlling weight, the ALJ should consider "all of the following factors" to determine the weight to be accorded to every medical opinion in the record: examining relationship; treatment relationship, including length of treatment relationship and frequency of examination and nature and extent of treatment relationship; supportability; consistency with the record as a whole; specialization of the medical source; and other factors. *See also Johnson*, 434 F.3d at 654. The ALJ's decision must explain the weight accorded to all opinion evidence. 20 C.F.R. § 404.1527(e)(2)(ii). In all unfavorable and partially-favorable decisions and in fully-favorable decisions based in part on treating sources' opinions, the ALJ must include the following:

> [T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reason for that weight.

SSR 96-2p.

The ALJ wrote the following regarding Dr. Machimada's opinion: "As a whole, Dr. Machimada's statement supports the claimant's allegations and Dr. Machimada is an expert in the treatment of rheumatological disorders and fibromyalgia. However, as discussed in this decision, I give this opinion little weight." Tr. at 29.

The ALJ indicated that, as of the date of the statement, Dr. Machimada had treated Plaintiff for less than one year. Tr. at 29. He noted that Dr. Machimada only indicated Plaintiff would have frequent interruptions of concentration and tasks due to fibromyalgia pain and drowsiness during the workday, but did not indicate any other work-related limitations of function. Tr. at 30. He pointed to more of what he perceived as discrepancies between Dr. Machimada's observations and Dr. Ruffing's observations and wrote the following:

> Dr. Machimada reports that she had observed the claimant as being "notably drowsy" and with "difficulty concentrating," but in contrast, Dr. Ruffing does not consistently record observations of altered mental status, decreased cognition, memory problems, or imbalance, for example, which seems somewhat unusual, if the claimant is "notably drowsy" and "has difficulty concentrating," and he has treated the claimant much longer than Dr. Machimada (see, generally, 3F, 4F, 6F, and 8F).

*Id.* He wrote "[i]n the same way, although Dr. Machimada states that she has observed the claimant's drowsiness and concentration problems, she has failed to record similar substantiating observations in her treatment notes consistently (2F and 7F)." *Id.* He also emphasized that, despite observing synovitis in Plaintiff's joints, tenderness in multiple major muscle groups, tenderness in some joints, problems making a fist, and pain with movement, Dr. Machimada "did not articulate any exertional, postural, or manipulative work related limitations." *Id.* He further indicated "[a]s the specialist in this instance, her absence on this point somewhat undermines Dr. Ruffing's proposed physical limitations and the severity of the claimant's allegations in this regard." *Id.*

The ALJ further stated that Dr. Machimada's treatment records failed to fully support her opinion. *Id.* He conceded that Plaintiff's subjective complaints and Dr.

Machimada's findings at visits prior to January 2012 supported that Plaintiff was experiencing an exacerbation of symptoms, but concluded that later records suggested Plaintiff's impairment and degree of limitation improved significantly after she started taking Plaquenil. Tr. at 32–34. The ALJ further explained his decision to accord little weight to Dr. Machimada's opinion as follows:

> Throughout her records, Dr. Machimada does not record observations consistent with the claimant experiencing a headache. Throughout her records, Dr. Machimada does not describe the claimant has appearing fatigued or with having altered mental status, poor concentration, decreased cognition, or problems with memory and recall, for example. During the visits, the claimant experienced some waxing and waning of symptoms, but overall, from October 2011 to August 2012, she consistently had normal exams of the HEENT, heart, lungs, abdomen, and skin, the extremities lacked cyanosis, clubbing, and edema, she was pleasant and in no acute distress, and the claimant denied fever, chills, cough, nausea, vomiting, dysuria, abdominal pain, chest pain, shortness of breath, and hematuria, for example. Throughout her records, Dr. Machimada does not report clinical signs or observations consistent with depression, anxiety, fibro fog, or significantly limiting negative side effects of medications. Dr. Machimada confirms that the claimant has no mixed connective tissue disease, and only mild arthritis of the knees. Dr. Machimada's records substantiate that since starting Plaquenil in January 2012, the claimant's blood pressure has remained relatively normal and the claimant has lacked synovitis in the hands, wrists, elbows, shoulders, ankles, and feet. As of August 2012, Dr. Machimada had not discontinued or significantly decreased the dosage of Plaquenil, which suggests that it has been somewhat effective with minimal negative side effects. Dr. Machimada has discontinued Lortab, because the claimant stated it did not help, but this statement is inconsistent with her prior statements that Lortab did help with the pain somewhat and with Dr. Machimada's willingness to prescribe it. Nonetheless, as discussed above the discontinuation of Lortab did not result in a significant increase in abnormal findings at the visit in August 2012 (2F and 7F). This summary of Dr. Machimada's treatment notes supports my giving little weight to her opinion and the other findings in the decision, including the residual functional capacity, the weight to the other physicians' opinions, and the weight to the claimant's credibility.

Tr. at 37–38.

The undersigned recommends the court find that the ALJ failed to adequately consider Dr. Machimada's opinion in light of the deference to be accorded to treating physicians' opinions under 20 C.F.R. § 404.1527 and SSA 96-2p. On the face of the decision, the ALJ appears to have examined all of the factors in 20 C.F.R. § 404.1527(c). The ALJ noted the examining and treatment relationships between Plaintiff and Dr. Machimada, indicating that Dr. Machimada had treated Plaintiff for less than a year and summarizing Plaintiff's treatment visits. *See* Tr. at 29–34, 37–38; 20 C.F.R. § 404.1527(c)(1), (2). He discussed the supportability of Dr. Machimada's opinion, noting that "[a]s a whole, Dr. Machimada's statement supports the claimant's allegations" and even found that some of her objective findings through January 2012 supported her opinion, but ultimately concluded that the entirety of her treatment notes did not support her opinion. *See* Tr. at 29–34.; 20 C.F.R. 404.1527(c)(3). He compared Dr. Ruffing's opinions and treatment notes to Dr. Machimada's opinion, identified inconsistencies between the two, and concluded that Dr. Machimada's opinion was not consistent with the record as a whole. *See* Tr. at 30; 20 C.F.R. § 404.1527(c)(4). The ALJ also noted that Dr. Machimada was a rheumatologist and a specialist at treating rheumatological disorders and fibromyalgia. *See* Tr. at 29; 20 C.F.R. § 404.1527(c)(5).

Despite what appears to be a meticulous examination of the factors set forth in 20 C.F.R. § 404.1527(c), the ALJ reached a conclusion regarding Dr. Machimada's opinion that was not supported by substantial evidence. Although he acknowledged the examining and treatment relationship between Plaintiff and Dr. Machimada, he minimized the significance of that relationship as having lasted for less than a year,

despite the fact that Dr. Machimada had thoroughly examined the claimant at eight regularly-scheduled visits throughout that period. *See* Tr. at 225–31, 284–300. The ALJ cited the abnormalities observed by Dr. Machimada during her examinations and on objective testing, but instead of finding that they supported the Plaintiff's allegations or assessing additional physical, postural, or manipulative limitations, he used the fact that Dr. Machimada neglected to identify specific restrictions as a reason to deny the claim. Tr. at 30. He pointed to observations by Dr. Machimada to suggest that Plaintiff's symptoms had improved even though Plaintiff continued to complain of pain and other symptoms and a reduced ability to function and Dr. Machimada did not indicate improvement. *See* Tr. at 284–94. The ALJ referenced what he viewed as a number of discrepancies between Dr. Ruffing's statements and Dr. Machimada's opinion, but he ignored the fact that both of Plaintiff's treating physicians unequivocally expressed opinions that Plaintiff's pain and related symptoms would prevent her from working. *See* Tr. at 233–38, 279–80, 281, 283, 284–85, 304, 305–07, 308–09. He also failed to acknowledge the differences between Plaintiff's treatment relationships with Dr. Ruffing and Dr. Machimada, one being her primary care physician and the other being her rheumatologist, which could reasonably account for perceived discrepancies. The ALJ used the opinion of Dr. Ruffing, to which he accorded little weight, to discredit Dr. Machimada's opinion, but gave great weight to the opinions of the state agency physicians who reviewed the evidence without having examined Plaintiff and without the benefit of any treatment notes after August and December 2011, respectively. *See* Tr. at 24, 30, 37. Although the ALJ acknowledged Dr. Machimada's status as a specialist in her

36

field, he undermined the diagnosis that she assessed and the evidence that she relied upon to reach that diagnosis. *See* Tr. at 29–30, 281; see also *Young v. Bowen*, 858 F.2d 951, 956 (4th Cir. 1988) (Absent evidence that contradicts the opinion of a concededly reliable expert, the Commissioner may not reject that expert's opinion.). Therefore, despite the fact that the ALJ examined each of the factors in 20 C.F.R. 404.1527(c), the undersigned recommends a finding that he did not accord proper deference to Dr. Machimada's opinion under the provisions of 20 C.F.R. 404.1527 and SSR 96-2p.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the ALJ, but to determine whether the ALJ's decision is supported as a matter of fact and law. Based on the foregoing, the court cannot determine that the Commissioner's decision is supported by substantial evidence. Therefore, the undersigned recommends, pursuant to the power of the court to enter a judgment affirming, modifying, or reversing the Commissioner's decision with remand in Social Security actions under sentence four of 42 U.S.C. § 405(g), that this matter be reversed and remanded for further administrative proceedings.

IT IS SO RECOMMENDED.

April 14, 2015                                            Shiva V. Hodges
Columbia, South Carolina                        United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).